Kiser & Co. *et al. v.* The Dannenberg Co. *et al.*

88  541
92  552
—————
88  541
93  232

1. A mortgage and other writings executed at the same time, and all springing out of the same agreement between debtor and creditor, are to be construed together as one instrument.

2. An insolvent debtor, besides assigning to one of his creditors about $3,000 of notes and accounts as collateral security, having made to him a mortgage upon a stock of goods and other personalty to secure an indebtedness of $3,400, the mortgage containing a power to sell the goods at wholesale or retail, and the creditor, by contemporaneous writings, having stipulated to pay off the debt of another creditor out of the proceeds of the notes, accounts and mortgaged property, and also to pay over to such other creditor all the money realized over and above $2,600, and stipulating moreover that when sold, the stock of goods should bring eighty per cent. of invoice cost, the mortgage, together with the contemporaneous writings, constituted an assignment within the meaning of the act of 1881, and unless the sworn inventory and schedule required by that act were prepared and attached, the mortgage was void.

3. The amendments to the petition offered and allowed being relevant to the purpose of the original petition, which was to obtain a receiver and set aside the mortgage, there was no error in allowing the amendments.

4. Where several defendants are all interested in the relief prayed against them, admissions of one of them made against his own interest, are receivable in evidence to affect him, although they would not be evidence to affect his codefendants.

5. The judge did not abuse his discretion in granting an injunction and appointing a receiver.

February 19, 1892.

Injunction and receiver. Debtor and creditor. Mortgage. Assignment. Evidence. Amendment. Before Judge Miller. Crawford county. At chambers, October 20, 1891.

The Dannenberg Co., Gibian & Co. and others by their petition alleged: Hartley was recently a merchant doing business in Crawford county, and is indebted by note to Dannenberg & Doody, a sum past due since September 15, 1891, payment of which has been demanded and refused; also by note to another of petitioners, a

part having been past due since October 1, 1891, and payment thereof has been demanded and refused; also to Gibian & Co. $661.50 by an account. Up to October 9, 1891, he was in possession of a stock of goods, books of account, notes, personalty, etc. On that day Kiser & Co., promising him that if he would turn over to them the stock of goods for an alleged indebtedness of $3,400, they would in future befriend him in such way as he might desire, they knowing at the time that he was insolvent and was indebted to petitioners as before alleged, and their efforts being to make such an arrangement with him as to defeat petitioners in the collection of their claims, in order to carry out this scheme, procured from him a pretended mortgage for $3,400. Immediately upon its execution, and as part of the same transaction, he turned over the keys of the store in which were his goods, books of account, notes, etc., making the agreement that, while the mortgage was apparently to secure an indebtedness of $3,400, Kiser would really collect only $2,600, and at the same time agreeing that he (Kiser) would sell the stock of goods at not less than eighty per cent. of their value, out of which he would first pay C. S. Taylor $785, and the surplus should be paid over to Taylor, stating at the time that it would be illegal to agree to pay this surplus to Hartley, but when it was paid to Taylor, Hartley and Taylor might arrange the surplus between themselves. The arrangement was really for the benefit of Hartley whom Kiser & Co. and Taylor knew to be insolvent and owing about $7,500, and that he was indebted to petitioners and others. It was a fraud in law upon petitioners and other creditors; the mortgage is void, and the goods are now held in fraud of petitioners and other creditors of Hartley. The goods are now locked in the store under an agreement that Kiser & Co. will meet with Hartley and Taylor on Monday next to take an inven-

tory, when the goods may be sold to some innocent party unless the sale is restrained. There has been no complete sale because no inventory has been taken, nor price agreed upon, nor was there to be an absolute delivery until the stock should be taken and the price ascertained. In the meantime Kiser & Co. are authorized to sell the stock, books of account and all the choses in action belonging to Hartley, and claim to have this power under the mortgage. Contemporaneously with taking the mortgage Kiser gave Taylor a writing to the effect that he was to pay Taylor $785 from the proceeds of such sale as he might make, out of the first money realized from the sale of the goods, etc. The prayer was, for cancellation of the instruments of writing referred to, receiver, injunction, judgment in favor of petitioners for their claims, to be paid from the proceeds of the sale of the property, etc. The Dunlap Hardware Co. was made a party complainant, upon its petition alleging that Hartley owed it $257.50 on notes and account, the notes being due October 1st and 10th.

Kiser & Co. demurred on the ground that the petition did not set forth any cause for injunction or receiver, and answered: Up to October 9th Hartley was a merchant, and on that day executed to these defendants a mortgage, with power of sale, to his entire stock of goods and some personalty. This mortgage was made to secure *bona fide* indebtedness due by him to them, of the amount and character described in the mortgage; and he was not only so indebted to them, but by far the larger part of the goods mortgaged were the identical goods for which the indebtedness was contracted. They took possession of the goods under the power in the mortgage, and would have proceeded to invoice them and offer them for sale but for the temporary injunction. They did not promise to befriend Hartley in such

a way as he might desire, but did assure him that if he would secure them they would be ready and willing to befriend him in any proper way, and showed him how it would be for his best interest to have a guarantee that his goods would bring full value instead of being sacrificed, and also that it was due them, to whom he owed about half of his indebtedness and of whose goods from two thirds to three fourths of the stock was composed, that they should not take chances on any more debt than other creditors. Their effort was not to make such an arrangement with him as would defeat petitioners in collecting their claims, nor did they enter into any scheme for that purpose, but it was to secure the indebtedness due them, and they did nothing unwarranted by law, right and justice. They would have got fuller and better security if they could, but could do no better than to leave nearly one fourth of the indebtedness due them unsecured and in the same condition as that of petitioners. Such security as they got, the mortgage, transfer of the notes and accounts as collateral, and possession of the stock, was obtained as follows: Petitioners and Ragan, a member of defendants' firm, had for a day or more been trying to get security for their claims, each urging Hartley to secure them, but to no purpose, until Ragan suggested to him that as he had no other creditor whose claim amounted to over $800, it would be but fair to secure these defendants to such an extent as would not force them to lose more than any other creditor. This suggestion seemed to meet with some favor, and Hartley said he wanted his friend Taylor paid, $2,600 of defendants' debt paid, and the balance divided *pro rata* among his creditors, including defendants for their balance, but that he was afraid his stock would be sacrificed. Defendants then agreed that if he would execute a mortgage with power of sale for their entire debt, deliver possession of the stock and

transfer the notes and accounts, they would take charge of the stock and sell it to the best advantage, guaranteeing it should realize eighty cents in the dollar, and would let the debt of Taylor be first paid, and after realizing $2,600 on their debt, would let the balance stand unsecured to share in a *pro rata* division of any surplus. The mortgage was executed, the notes and accounts transferred to defendants, and they were put in possession of the stock. They deny that there was any purpose to create a trust for the benefit of any of the defendants, but on the contrary it was the purpose and agreement to give the creditors the benefit of all the property in the manner stated. All allegations of fraud were denied, etc. The stock of goods did not exceed at invoice price $3,500 and were not worth and would not have brought over $2,500. It was not expected that the stock would invoice enough to pay Kiser & Co. $2,600 and Taylor his debt. It was expressly understood that any surplus from the sale of the mortgaged property, or from the collaterals, should be applied first to pay Taylor, then $2,600 to Kiser & Co. and the excess to *pro rata* division among the creditors. Kiser & Co. proposed that Taylor should take charge of the excess and make such *pro rata* distribution, but to this he did not consent, and there was no actual agreement as to who should distribute the excess, but it was not to go to Hartley, and there was no agreement or understanding that the excess should be paid to Taylor and that he and Hartley might arrange as to the excess. At the time the mortgage was executed Hartley had twelve or fifteen bales of cotton which he refused to include in it, and had other property the amount and value of which is unknown to these defendants.

Upon the hearing of the application for injunction plaintiffs offered to amend (1) by striking the allegation that Hartley was recently in possession of the

v 88 35

goods, and all allegations indicating that he had parted with the possession thereof or had ceased to be a merchant and trader; (2) by alleging that in contemplation of law he was a trader when the petition was filed and was at that time in possession of the goods; and (3) by alleging that the indebtedness of Gibian & Co. and of the Dunlap Manufacturing Co. (which appeared by intervention at the hearing for the purpose of becoming a party plaintiff) was past due at the time of filing the original petition, and that payment had been demanded of Hartley and refused. These amendments were allowed over objection of counsel for Kiser & Co. Exceptions were taken to this ruling, to the grant of the injunction and appointment of a receiver, to the overruling of the demurrer, and to the admission of an affidavit of Dannenberg hereafter mentioned, to which Kiser & Co. objected as being purely hearsay evidence as to them.

Upon the hearing Hartley made affidavit: On October 9th he gave Kiser & Company what he understood to be a mortgage with power of sale upon his stock of goods, for $3,400, agreeing with their representative that on a sale of the goods they should first pay Taylor $785, Kiser stating that deponent would need friends and intimating that they would befriend him. Deponent desired to know what would become of the surplus after these payments were made, when Kiser's man was inclined to be reticent, but finally said they would pay it over to Taylor and that Taylor and deponent might arrange between themselves as to the surplus. Deponent's desire was that he might have the surplus to pay to his other creditors. While the mortgage was for $3,400, it was to be enforced under the agreement for only $2,600; the other $800 they would share equally with other creditors. All the parties understood that deponent was to get the surplus after payment of the

$2,600 and the $785. Kiser & Co. knew at the time of deponent's status and that he would not be able to pay all his creditors, and he turned over the keys of the store to their agent with an understanding that they were to meet him and Taylor on Monday, October 12th, take stock and complete the arrangements as above set forth. The debts owing to Gibian & Co. and the Dunlap Hardware Co. were past due, payment had been demanded, and deponent could not pay. He turned over to the receiver the key with which he got into the store.

The affidavit of Dannenberg was: On October 10, 1891, Taylor made a statement, in substance, that cotemporaneously with the giving of the mortgage there was an agreement between Hartley and the representative of Kiser & Co., that while the mortgage was apparently to cover an indebtedness of $3,400, it was to operate as a lien and be enforced for only $2,600, and when Kiser should sell the property under the conditions in the mortgage, he should first pay to Taylor $785, and the representative of Kiser & Company gave Taylor a writing to this effect; that it was further agreed, at the time of the giving of the mortgage and as a part of the same transaction, that after paying Taylor, Kiser would reserve $2,600, and the overplus, if any, he would pay over to Taylor, Kiser guaranteeing that the stock should bring as much as eighty per cent.; that Hartley desired to know what would become of the overplus, and Kiser's representative was at first reticent, but finally said he would pay it over to Taylor, and Taylor and Hartley could dispose of it between themselves; that he would pay it to Taylor because it would be illegal for him to agree to pay it to Hartley; that upon the execution of the mortgage Hartley turned over one of the store keys to Kiser's representative, with the understanding that he was to return to the store on Monday and meet Taylor and Hartley to take an inventory in

order to sell the goods; that Hartley made substantially
the same statement as that made by Taylor; that the
statements were made at the request of counsel to state
the facts exactly as they occurred, and deponent believes,
from the manner both of Taylor and Hartley, that they
did state the facts correctly and as they occurred.

Taylor at the hearing testified: Kiser & Co. agreed
the goods should bring eighty per cent. of invoice cost.
They were to be secured for $2,600, and the remainder
of their claim should share in surplus with other cred-
itors. It was agreed that witness was to be paid from
first proceeds of sale. Ragan, a member of Kiser & Co.,
said he was willing to turn the surplus over to witness,
who did not give a direct answer as to whether he would
accept it, but inferred, from what Ragan said, it would
not be legal to pay it to Hartley. Witness, if he did
not accept the surplus, did not know what was to be-
come of it. Ragan said witness was to pay the sur-
plus to other creditors, and when witness asked whom
he was to obey in disposing of the funds, he made no
reply that witness knows. It seemed to be Ragan's de-
sire that the surplus should be shared with other cred-
itors and not Hartley. It was not witness's understand-
ing that it was to go to Hartley, and if Hartley and
Ragan had any other understanding witness was not a
party to it. The surplus was to go to Hartley's cred-
itors. Witness did not agree to accept it in trust for
the creditors and pay it over to them, though Ragan
might have understood he was willing to do it. Wit-
ness got his paper after the mortgage was signed. It
was agreed before the mortgage was given that he should
be paid, and after the mortgage was signed he was
given a writing to make it binding.—Two instruments
were introduced. The opinion sets them out, and recites
the terms of the mortgage so far as necessary to be re-
ported.

Rivers, a salesman of Kiser & Co., swore as follows : On October 9th he was present at the interview between Ragan and Hartley and when the mortgage was executed. He heard the agreement between Hartley and Ragan, and knows that no benefit direct or indirect was to accrue to Hartley, except the benefit he would get in having his stock bring at least eighty cents in the dollar, all of which was to go to his creditors. He has seen the answer of Kiser & Co., and knows the facts to be as therein stated. He examined the stock of goods, identified those sold Hartley by Kiser & Co., is satisfied that three fourths of the stock was supplied by them, and knows positively that at least two thirds was.

Candler & Thomson and H. A. Mathews, by Harrison & Peeples, for plaintiffs in error.

Hardeman, Davis & Turner, *contra*.

Simmons, Justice.

Certain creditors of J. F. Hartley filed their petition against him and against Chas. S. Taylor and M. C. & J. F. Kiser & Co., praying for an injunction and the appointment of a receiver, and for the cancellation of a mortgage executed by Hartley to Kiser & Co., and other writings connected therewith. The petition and amendments, together with the answer and affidavits, so far as material, are set out in the reporter's statement. The ruling granting the injunction and appointing a receiver, was upon the ground that the mortgage and contemporaneous writings and agreements constituted an attempt to make an assignment on the part of Hartley, and not conforming to the statute, the whole transaction, including the mortgage, was void. The statute upon which this ruling was predicated requires that "in all cases of voluntary assignments by insolvent debtors for the benefit of creditors, it shall be the duty of the person . . making such assignment to prepare and attach to the

deed, or instrument by which the assignment is made, at the time of executing the same, a full and complete inventory and schedule of all the assets of every kind, held, claimed or owned by such insolvent person . . at the time of the execution of such deed or other instrument of assignment, which inventory or schedule shall be sworn to," etc. And it further provides that "no deed or other instrument of assignment by insolvent persons . . shall be valid unless accompanied by the sworn schedule required." Acts 1880-1, p. 174.

It appears from the record that Hartley, on the 9th of October, 1891, being then insolvent, executed to Kiser & Co. a mortgage upon a stock of goods and other personalty, to secure an indebtedness to them of $3,429.90, the mortgage containing a power to sell the goods at wholesale or retail; and at the same time transferred to them, as collateral security, notes and accounts having a face value of about $3,000. Contemporaneously with the execution of the mortgage, Kiser & Co. executed the following instruments:

"TAYLOR, GA., Oct. 9, 1891.
"Chas. S. Taylor: We hereby agree that your debt against J. F. Hartley, amounting to seven hundred and eighty-five and 50-100 dollars, shall be paid first, before we realize anything on our debt from said Hartley, arising from goods, notes and accounts, and mules and horses.          (Signed) M. C. &. J. F. KISER & Co."

"TAYLOR, GA., Oct. 9, 1891.
"Whereas J. F. Hartley did on this day convey to M. C. & J. F. Kiser & Co., by an absolute mortgage, his entire stock, and wishing now to protect Chas. S. Taylor of Crawford county, Ga., we hereby agree and bind ourselves, that said stock of goods shall, when sold, bring eighty cents in the dollar of invoice cost, and all over twenty-six hundred dollars shall be paid to Chas. S. Taylor. Having transferred about three thousand dollars of notes and accounts to us as collateral, we agree that Chas. S. Taylor shall be paid, out of the first money

received, his debt in full—seven hundred and eighty-five and 50-100 dollars.

(Signed) M. C. &. J. F. KISER & Co."

The mortgage and other writings, being executed at the same time, and all springing out of the same agreement between debtor and creditor, are to be construed together as one instrument. Burrill, Assignments, §128. Thus understood, they constitute, in our opinion, an "instrument of assignment" within the meaning of the statute. We have held that the act is to be liberally construed in favor of creditors and strictly against the debtor and his assignee. "It is to be enforced in a liberal spirit to suppress the evil at which it aims a blow." *Coggins* v. *Stephens*, 73 *Ga.* 414; *Crittenden* v. *Coleman*, 70 *Ga.* 293. Here a debtor insolvent at the time, transfers and delivers to a creditor his entire stock of goods and other personalty, with power to sell, the creditor agreeing that the goods shall bring a certain price, and agreeing further to appropriate the proceeds first to the debt of another creditor, then to its own, and to pay the surplus to such other creditor. Whether the trust was merely for one of the defendants, or, as was contended, for the entire body of creditors, we need not consider. It is the element of trust which brings it within the statute. Nor does it matter that the conveyance was in form a mortgage. It is sufficient that the security inures not merely to the benefit of the mortgagee, but also to that of another creditor for whom he holds in trust. In our opinion the act embraces every conveyance by the insolvent debtor of his property, whether absolute or in the form of a security, to be held by the person taking it for the benefit of some one or more of the creditors of the debtor. If its provisions could be evaded by changing the character of the instrument, the statute would amount to a mere nullity. "To give such a cconstruction is to suppose the legislature ab-

surdly attempting to suppress a mischief in one form, and leaving another equally convenient and effectual in which it might with impunity be accomplished." Ranney, J., in Harkrader *v.* Leiby, 4 Oh. St. 611. In that case it was held that a mortgage under which the mortgagee becomes a trustee for another creditor or creditors, is an assignment, under the act relating to assignments by insolvent debtors. In Bloom *v.* Noggle, 4 Oh. St. 45, it was held that if the mortgagee "attempts to extend the lien beyond the necessity of his own indemnity to secure the debt of another creditor, the mortgage is in substance and effect an assignment within the provisions of the act."

Treating this transaction as an assignment within the meaning of the act of 1881, and there being no sworn inventory and schedule prepared and attached, the mortgage, under the terms of the act, was void. *Coggins* v. *Stephens,* and *Crittenden* v. *Coleman, supra.*

Other questions in the case are ruled by the head-notes.

*Judgment affirmed.*